UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TARA HARMON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BOSTON MEDICAL CENTER, )<br>)<br>Defendant. ) | Civil Action No. 22-11856-MJJ |

MEMORANDUM OF DECISION

November 18, 2024

JOUN, D.J.

This case arises out of Plaintiff Tara Harmon's ("Ms. Harmon" or "Plaintiff") allegations of religious discrimination against Defendant, Boston Medical Center ("BMC" or Defendant"). After Ms. Harmon, a registered nurse ("RN"), was denied a religious exception to BMC's COVID-19 vaccination requirement, she filed the operative Complaint alleging she was denied the exception due to her religious beliefs. Now before the Court are Defendant's Motion for Summary Judgment and Plaintiff's Motion to Strike. [Doc Nos. 45, 48]. For the reasons below, Plaintiff's Motion is DENIED and Defendant's Motion is GRANTED.

I.  BACKGROUND

    A.  Facts

Ms. Harmon was employed as an RN at BMC, a hospital in the South End of Boston. [Doc. No. 46 at ¶¶ 1-2]. From 2019 to 2021, she worked at BMC's outpatient Cardiovascular

1

Clinic. [*Id.* at ¶ 3]. From July 2020 to September 2020, Ms. Harmon worked in the Emergency Department at BMC. [*Id.* at ¶ 10]. Ms. Harmon provided direct care to patients, providing medications, taking blood pressure, dressing wounds, doing EKGs, and assisting patients in day-to-day needs, as well as interacting with other BMC staff. [*Id.* at ¶¶ 4-5]. Between January 31, 2020, to July 31, 2021, BMC treated 3,281 patients for COVID-19, of which a total of 226 patients died from COVID-19 or COVID-19 related complications at the BMC. [*Id.* at ¶ 7]. Several hundred BMC staff members reported contracting COVID-19 during this time. [*Id.*]. As a result of COVID-19 pandemic, BMC closed its Cardiovascular Clinic in July 2020. [*Id.* at ¶ 9]. Subsequently, between July 2020 and September 2020, Ms. Harmon worked in BMC's Emergency Department caring for COVID-19 and trauma patients. [*Id.* at ¶ 10].

In the summer of 2020, Ms. Harmon heard about and began researching the COVID-19 vaccine; Ms. Harmon testified that she believed the vaccine "never made it past emergency release" and was experimental. [*Id.* at ¶ 11]. In January 2021, BMC began offering the COVID-19 vaccine to its employees. [*Id.* at ¶ 12]. On July 13, 2021, BMC announced that it would be requiring all employees to receive the COVID-19 vaccine. [*Id.* at ¶ 13]. In August 2021, BMC implemented the Immunization Policy, requiring all employees to be vaccinated against COVID-19 (the "Policy"). [*Id.* at ¶ 14]. BMC relied on the Centers for Disease Control and Prevention ("CDC") recommendations and its own experience in the pandemic when it determined that mandating vaccination was the best way to reduce the risk of transmission amongst healthcare workers and between healthcare workers and patients. [*Id.* at ¶ 15]. At the time BMC implemented the Policy, the CDC recommended vaccination as the best way to prevent COVID-19 infection and transmission of the virus. [*Id.* at ¶ 16]. BMC also relied on the CDC's assessment and its own experience during the pandemic that greater risk of transmission would

impair the hospital's ability to provide safe care for its patients, increasing the possibility of legal liability and negatively impacting BMC's reputation. [*Id.* at ¶ 42].

On August 24, 2021, Ms. Harmon submitted a request for religious exemption from the Policy, stating that her religious beliefs prevented her from receiving the COVID-19 vaccine. [*Id.* at ¶ 19]. Specifically, Ms. Harmon stated "…it is sacrilege to introduce into the body living organisms or any unnatural matter that may alter the natural balance of that organism rendering it into a state of dis-ease" and that "[v]iolation of the integrity of these natural endowments shall result in a state of dis-ease that state in which the living organism is no longer within a divine state of harmonious balance." [*Id.* at ¶ 20]. In her religious exemption request, Ms. Harmon stated she "enrolled as a member of the Congregation of Universal Wisdom [(the "Congregation")] and no member of the Congregation should have anything injected, infused, or ingested that contains foreign materials of unhealth or unnatural composition. The above position includes flu or covid vaccines." [*Id.* at ¶ 21].

Ms. Harmon attached her enrollment certification and the Congregation's tenets and beliefs to her religious exemption request. [*Id.* at ¶ 22]. The Congregation's tenets forbid members from injecting, ingesting, or infusing into the body any "foreign materials of unhealth or unnatural composition." [*Id.*]. The Congregation's tenets also prohibit members from having surgical instruments cut or pierce the tissues of the body. [*Id.*]. The only form of healing permitted by the Congregation is the "laying on of the hands to the vertebrae." [*Id.*]. The Congregation requires unequivocal adherence to the principles of the congregation and the laying on of hands on the vertebrae. [*Id.*]. Ms. Harmon testified that she joined the Congregation on December 5, 2020, because she likes "their beliefs of my body is my sacred vessel. And I am in control. Nobody else is in control. And I decide what goes into my body." [*Id.* at ¶ 23].

The Congregation requires members to pay a fee when joining; however, Ms. Harmon gave a donation when she joined for an amount she does not recall. [*Id.* at ¶ 24]. Ms. Harmon testified she does not agree with all the Congregation's beliefs, including the Congregation's prohibition of any form of healing other than "the laying on the hands to the vertebrae," that it is sacrilege to inject any medication or other chemical substance into the body, and prohibition of surgical instruments cutting or piercing the tissues of the body. [*Id.* at ¶¶ 29-31].

Between December 2020 and May 2021, Ms. Harmon ingested prescribed and over-the-counter medication, underwent plastic surgery, had blood drawn, had a biopsy, and underwent a colonoscopy during which she was injected with anesthesia through an IV. [*Id.* at ¶¶ 26, 28]. From December 2021 to the date of this filing, Ms. Harmon ingested prescribed medication daily. [*Id.* at ¶ 27]. In the past, Ms. Harmon received the flu vaccine annually from 2013 through 2020; she has received several vaccines in the past. [*Id.* at ¶ 17]. Mr. Harmon has not received a flu vaccine since 2020. [*Id.* at ¶ 17].

On September 24, 2021, BMC informed Ms. Harmon that it was denying her request for religious exemption to the Policy. [*Id.* at ¶ 34]. Ms. Harmon appealed and submitted additional materials regarding her religious beliefs. [*Id.* at ¶ 35]. In this appeal, Ms. Harmon stated she "developed natural immunity to Covid" and this was evidenced by her results from the "BMC RN antibody study." [*Id.* at ¶¶ 36-37]. The BMC team conducting the study warned against interpreting antibodies as a protection against infection or helping reduce the severity or duration of a future COVID-19 infection. [*Id.* at ¶ 40]. On October 7, 2021, BMC once again denied Ms. Harmon's request for religious exemption. [*Id.* at ¶ 41].

### B. Procedural History

On October 31, 2022, Ms. Harmon filed a Complaint against BMC alleging Religious Discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count I) and the Massachusetts anti-discrimination law, M.G.L.c. 151B (Count II). [Doc. No. 1]. On May 1, 2024, BMC moved for Summary Judgment on substantive grounds. [Doc. No. 45]. On May 21, 2024, Ms. Harmon filed a Motion to Strike material facts alleged by BMC relating to the CDC's recommendations on the COVID-19 vaccine. [Doc. No. 48].

## II. LEGAL STANDARD

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Generally, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (cleaned up). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary

judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson*, 477 U.S. at 252).

### III.     ANALYSIS

#### A. <u>Plaintiff's Motion to Strike</u>

Ms. Harmon seeks to strike Defendant's statements pertaining to the CDC's recommendations that vaccinations protect against the transmission and severity of COVID-19. Specifically, Ms. Harmon claims the below bolded statements are hearsay and should not be included in the record for summary judgment. [Doc. No. 48 at 2]. The disputed statements are provided by in the declaration by John Hickey, which include the following:

> 11.     The hospital's decision to require employees to be vaccinated against COVID-19 **was based on the recommendation of the Center for Disease Control and Prevention ("CDC")** that vaccination was the best way to protect against severe illness, hospitalization, and death, and reduce the transmission of COVID-19.
>
> 12.     **Based on the recommendations of the CDC** and its own experience between January 31, 2020 and July 1, 2021, BMC knew that healthcare workers were more likely to contract COVID-19 than others because they faced significant exposure to the virus through infected patients and other healthcare staff.
>
> 13.     Importantly, **based on the recommendation of the CDC** and its own experience between January 31, 2020 and July 1, 2021, BMC knew that healthcare workers were at increased risk of infecting their patients, which included persons who were medically vulnerable to serious complications and death from the disease.
>
> 15.     At the time BMC implemented the Policy, **the CDC recommended vaccination as the best way to prevent COVID-19 infection and transmission of the virus**.
>
> 22.     **Based on the recommendations from the CDC**, BMC determined that alternatives to the COVID-19 vaccine, such as masking, periodic testing, and social distancing, would not be as effective as the COVID-19 vaccine in reducing transmission. BMC also determined, from its experience between January 31, 2020 and July 31, 2021, that social distancing is not always practicable for staff and patients and testing is inadequate to reduce transmission because it may miss infections on days staff are not tested.

[Doc No. 47-2 at ¶¶ 11, 12, 13, 15, 22] [emphasis added].

Statements of hearsay are inadmissible and may not be considered on summary judgment. *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Id.* (citing Fed. R. Evid. 801(c)). "Out of court statements offered not for their truth but 'offered only for context,' do not constitute hearsay." *United States v. Bailey*, 270 F.3d 83, 87 (1st Cir. 2001) (cleaned up). "For example, an out-of-court statement might be offered to show that the declarant had certain information, or entertained a specific belief, or spoke a particular language; or it might be offered to show the effect of the words spoken on the listener (e.g., to supply a motive for the listener's action)." *Id.* (cleaned up).

Contrary to Ms. Harmon's assertion, Attorney Hickey's above statements were provided to demonstrate the information available that informed BMC's decision to implement the Immunization Policy. Attorney Hickey's statements were not made to prove the truth of the CDC's recommendations or the vaccine's efficacy; they simply demonstrate the context behind the Immunization Policy. Furthermore, rather than being inconsistent as Plaintiff asserts, Attorney Hickey's interrogatory responses, i.e. that BMC lacks knowledge sufficient to respond to if and how long COVID-19 vaccines protect a recipient against infection, support that the disputed statements were provided to demonstrate the effect on the reader. In other words, because Attorney Hickey provided these statements as merely an impetus for BMC's Policy, it follows that he is unable to speak on the scientific analysis of the vaccine's efficacy. Accordingly, the disputed statements are not hearsay under Fed. R. Evid. 801(c). Thus, the disputed statements will remain part of the record for purposes of summary judgment. *See Gladu v. Correct Care Sols.*, 15-cv-00384, 2018 WL 881759 at *7 (D. Me. Feb. 14, 2018), *aff'd* 18-cv-

1167, 2019 WL 10982435 (1st Cir. Aug. 30, 2019) (Evidence is relevant predominantly for non-hearsay purposes because it explains witness' reaction and further decisions afterward, rather than for the hearsay purpose of the truth of the matter asserted).

### B. Defendant's Motion for Summary Judgment

Title VII declares it an "unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e-2(a).

The First Circuit applies a two-part framework in analyzing religious discrimination claims under Title VII.[1] *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126,133 (1st Cir. 2004) "First, [a] plaintiff must make her prima facie case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action." *Id.*; *see also Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023). Second, once the plaintiff establishes a prima facie case, "the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." *Cloutier*, 390 F.3d at 133.

Here, it is not necessary for the Court to decide whether Ms. Harmon has made her prima face case because, regardless of whether she has, the Defendant has met its burden to articulate an undue hardship in granting Ms. Harmon's accommodation.

---

[1] The Massachusetts Supreme Judicial Court applies federal anti-discrimination case law when construing M.G.L. c. 151B, so this Court uses the same framework to assess both claims. *See Noviello v. City of Boston,* 398 F.3d 76, 91 (1st Cir. 2005) (applying federal case law to Chapter 151B claim and citing *Wheatley v. Am. Tel. & Tel. Co.,* 418 Mass. 394 (1994)).

Because Defendant did not offer a reasonable accommodation, it must prove that any accommodation for the plaintiff would have resulted in an undue hardship for the hospital. *Lowe v. Mills,* 68 F.4th 706, 719 (1st Cir. 2023). Under Title VII, an undue hardship is established when "it would impose more than a *de minimis* cost on the employer" and "the burden is substantial in the overall context of an employer's business." *Cloutier,* 390 F.3d at 134. In conducting an undue hardship analysis, the court may consider "not only . . . direct economic costs, but the indirect ones related to health and safety." *Together Emps. v. Mass Gen. Brigham Inc.,* 573 Supp. 3d. 412, 435 (D. Mass. 2021), *aff'd* 32 F.4th 82 (1st Cir. 2022). Additionally, effects onto the reputation of the business can also constitute an undue hardship. *Cloutier,* 390 F.3d at 136; *see also Together Employees,* 573 F. Supp. 3d at 436.

Here, BMC has established that granting Ms. Harmon's accommodation would have resulted in an undue hardship for the hospital. Ms. Harmon's work as an RN placed her in a particularly risky position to spread infection, as she was in-person and in close contact with vulnerable patients, their families, and other BMC staff. Allowing her to remain unvaccinated would have increased the risk of spreading COVID-19 throughout the hospital and beyond. *See Antredu v. Massachusetts Dep't of Youth Servs.*, No. 22-cv-12016, 2024 WL 1539725 at *5 (D. Mass. Apr. 9, 2024) (concluding that accommodating plaintiff's request to remain unvaccinated constituted an undue hardship due to plaintiff's close proximity to patients and that staff placed clients and colleagues at a higher risk of COVID-19). Furthermore, increased risk of transmission of COVID-19 within the hospital would "negatively impact its reputation of providing safe care for patients and would increase the possibility of legal liability." [Doc. 46 at ¶ 42]. Therefore, if BMC allowed the accommodation, such accommodation would impede the BMC's ability to provide a safe environment for their already vulnerable patients, and negatively

9

impact its reputation. Thus, BMC has established that granting Ms. Harmon's accommodation would have resulted in an undue hardship for the hospital.

Ms. Harmon argues that BMC's undue hardship defense relies on the faulty premise that the products advertised as COVID-19 vaccines protect against infection and transmission of COVID-19, which is in dispute. BMC relied on its own experience during the pandemic and the CDC's recommendation that vaccination was the best way to prevent COVID-19 infection and transmission of the virus. Ms. Harmon has not provided sufficient support to demonstrate that such reliance and BMC's experience was unreasonable other than her bare assertion that she believed the vaccine "never made it past emergency release" and was experimental. [Doc. No. 46 at ¶ 11]. Similarly, Ms. Harmon's assertion of her natural immunity is rebutted by her own cited BMC study that warned against interpreting antibodies as a protection against infection. [Doc. No. 46 at ¶¶ 36-37]; *see Melino v. Bos. Med. Ctr.*, 22-cv-12119, 2024 WL 2724145 at *2 (D. Mass. May 28, 2024) (Court did not lend credence to Plaintiff's challenge that the vaccine did not protect against infection where the record was devoid of evidence from which a reasonable juror could find for her medical hypothesis.).

## IV.    CONCLUSION

For the above reasons, Plaintiff's Motion to Strike is <u>DENIED</u> and Defendant's Motion for Summary Judgment is <u>GRANTED</u>.

SO ORDERED.

                                             /s/ Myong J. Joun
                                             United States District Judge